# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 23, 2010 Session

## STATE OF TENNESSEE v. BALDOMERO GALINDO

**Appeal from the Criminal Court for Knox County**
**No. 83885**
**Ken Irvine, Judge (at trial), Bob R. McGee, Judge (at motion for new trial)**

_____

**No. E2009-00549-CCA-R3-CD - Filed November 19, 2010**

_____

The Defendant, Baldomero Galindo,[1] was convicted by a Knox County Criminal Court jury of first degree murder, for which he is serving a life sentence. On appeal, he contends that (1) the trial court erred in dismissing his motion for new trial on the basis it was untimely, (2) the evidence is insufficient to support his conviction, (3) the trial court erred in denying his pretrial motion to suppress his inculpatory statement, and (4) the trial court erred in denying his motion for a mistrial based upon the State's failure to disclose discovery materials in a timely manner. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

Mike Whalen, Knoxville, Tennessee, for the appellant, Baldomero Galindo.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Randall E. Nichols, District Attorney General; and Philip H. Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] The record reflects that the indictment and judgment identified the Defendant as Galindo Baldomero. The trial court's minutes reflect that the court granted a motion to amend the name in the indictment to "Galindo Baldomero," which appears to be a typographical error because the transcript from the corresponding date reflects that defense counsel told the court that the Defendant's correct name was Baldomero Galindo. We conclude that the trial court granted the motion to amend the indictment to identify Baldomero Galindo as the charged party, and we use that name in this appeal

## OPINION

This case involves a fatal assault of Heather Lovette, the Defendant's former girlfriend. The evidence at trial demonstrated that the victim died as a result of blunt force trauma to her head, which had been inflicted with a hammer.

Barbie Swann testified that she and the victim were best friends from age twelve forward. She said that a week before the victim was killed in August 2005, she moved out of the victim's apartment and into her grandmother's house, "two buildings up" from the victim's apartment. She said she moved because the victim was going to regain custody of her four children. She said that when she and her boyfriend lived in the victim's apartment, the Defendant, the Defendant's brother, and the victim also lived there. She said the Defendant was the victim's boyfriend.

Ms. Swann testified that the Defendant came to her new residence on August 18 and asked her boyfriend to help him find a place where he and the Defendant's brother could live. She said that he stated he did not know where the victim was and asked Ms. Swann's boyfriend to let him know if Ms. Swann said anything about the victim's whereabouts. She said she would not have told him had she known and explained that she understood that the victim did not want to have any contact with the Defendant.

Ms. Swann testified that she spoke and understood Spanish. She said the Defendant was learning to speak English but that he understood it well. She said she and the Defendant usually spoke English to each other.

Ms. Swann testified that she went to the victim's apartment around 6:00 or 7:00 p.m. on August 18 to retrieve a few belongings remaining in the apartment. She also said she felt uncomfortable because she knew the victim was trying to get away from the Defendant and that she and her boyfriend chose to go to the victim's apartment when the Defendant and his brother were away. She said she retrieved some of her property in a box. She said there was a red hammer she had borrowed from the victim in the box. She said she left the hammer on the kitchen table. She identified the hammer as the one that was an exhibit and stated that it was not missing parts of its plastic handle on August 18. Ms. Swann testified that as she and her boyfriend were walking home, they saw the Defendant and his brother returning. She said that her memory was vague but that her boyfriend may have spoken to them for a minute while she went ahead to her new home.

On cross-examination, Ms. Swann testified that she told the police about the hammer. She said that if this was not reflected in the tape of her interview by the police, it would be because "they would have had to cut that part out." She admitted the Defendant did not like that she and the victim used drugs together, but she denied

suspecting that the victim asked her to move out due to pressure from the Defendant. She said she thought the victim and the Defendant planned to get married but their plans changed when the victim decided to regain custody of her children. She said the victim wanted to reunite with Michael Leuty because he would help her with the children. She acknowledged telling the police the reason the victim wanted to reunite with Mr. Leuty was that he would provide financial assistance.

Ms. Swann testified that she never saw the victim in a violent situation with Mr. Leuty. She acknowledged that she had seen the victim "run off and [Mr. Leuty] enter the apartment and her not be there." She admitted that she did not like the Defendant.

Ms. Swann testified that the Defendant was upset on August 18 about not knowing the victim's whereabouts. A portion of Detective Huckleby's August 19 taped interview of Ms. Swann was played, after which Ms. Swann acknowledged that she said in the interview that the Defendant was not upset. She also admitted that she did not say anything about the hammer in this interview.

On redirect examination, Ms. Swann testified that she was also interviewed by the authorities on August 26 and September 30. She acknowledged mentioning the hammer on September 30, although she said she thought she had mentioned it on August 26. She said she was not asked about a hammer on August 19. She said that when she was shown a photograph of the hammer at a later date, it was in a different condition than it was when she left it on the table.

Michael Leuty testified that he was convicted in Montana of felony burglary, felony accountability to burglary, and felony criminal mischief. He said he served time in prison and completed a boot camp program for the crimes.

Mr. Leuty testified that he met the victim through her sister in 2002. He said that he and the victim were romantically involved and that they began living together in June 2002. He said that the victim's four children also lived in their home and that he assisted in supporting them. He said he lived with the victim "off and on" for three years. He said that the victim had a problem with crack cocaine and that he needed to stay away from crack.

Mr. Leuty testified that he and the victim were separated from February or March 2005 until the victim's birthday on August 7, 2005. He said that he did not know the Defendant during this time. He said he moved across the street from the victim on August 8 because he was still in love with her. He said he saw the Defendant at the victim's home during this time. He said he and the victim first talked about reconciliation on the following Wednesday, when the victim moved into his home. He said this was

3

approximately August 16 or 17.  He said the victim did not leave his home because she did not want the Defendant to know where she was.

Mr. Leuty testified that he was working for Jones Woodcrafters at the time and that he worked during the day on August 19.  He said the victim was unemployed.  He said that he awoke about 6:00 or 6:30 a.m. and that his boss, Michael Pruitt, picked him up around 7:30 or 8:00 a.m.  He said the victim was still sleeping in his bed when he left.  He said she was lying on her stomach with her head turned to the right and away from the window.  He said that he spoke to her before he left and that she acknowledged him.  He said he left the victim a note stating that he would see her on Sunday to help her move back into her apartment.  He said he did not know whether the victim would be there when he returned that afternoon.  Mr. Leuty testified that the only air conditioning in the apartment came from a window unit in Elizabeth Koetzler's bedroom.

Mr. Leuty testified that he worked eight or nine hours that day at a job site that was about five miles past Maryville and that he returned home about 6:30 p.m.  He said he did not have a key to the apartment, which was locked when he came home that evening.  Mr. Leuty testified that the Defendant's red Ford F-150 and Ford Probe were both in front of the victim's apartment that morning and when he returned that evening.  He said he did not see anyone home at the victim's apartment that evening.

Mr. Leuty testified that because they were in a bad neighborhood and he had his work tools with him, his boss waited with him.  He said he used Mr. Pruitt's cell phone to call Elizabeth to let him into the house but was only able to leave her a voice mail message.  He said that he remembered the window to his bedroom at the back of the apartment and that he was able to open it.  He said that he stepped onto the bed and that the victim was still asleep.  He said that he told the victim he was home and to get up but that she did not respond.  He said he ran to the front of the house to open the door for his boss and to get his tools inside.  He said he then went back to the bedroom to wake the victim.  He said that she was in the same position as she had been that morning and that when he began shaking her, she was unresponsive.  He said that he grabbed her wrist and that it was cold.  He said that he flipped her over by her shoulder.  He said that when he did so, he saw blood everywhere on the bed and in a huge puddle on the floor.  He said that he began screaming and stumbled out of the house.  He said that he was crying and asked Mr. Pruitt to call 9-1-1.  He said that the Defendant and his brother were standing across the street watching him cry.  He said the Defendant's brother left in a truck, that the Defendant continued watching him for three or four minutes, but that the Defendant left in the Ford Probe before the police arrived.

Mr. Leuty testified that Detective Huckleby interviewed him three times and that he told Detective Huckleby he was not involved in the victim's death.  He said that he

learned in the third interview that his handprint was in the apartment and that Detective Huckleby arrested him after this interview. He said he was in jail almost thirty days but was released on September 22. He said that he was angry but that he later provided the police with information about the victim's hammer, which he said had been her grandfather's. He said the hammer was red and had a rubber handle. He said he remembered this hammer being in the victim's apartment when they lived together previously. He said the only hammer in Elizabeth Koetzler's apartment was his twenty-two ounce framing hammer, which had a wooden handle. He denied hitting the victim with a hammer.

On cross-examination, Mr. Leuty testified that the victim was afraid of the Defendant. He said she came to the apartment and stayed inside due to her fear. He said the victim told the Defendant to leave her house and waited for three days at the apartment where Mr. Leuty lived for the Defendant to leave.

Mr. Leuty testified that when the victim and the Defendant lived together, the victim's children were living with the victim's mother. He said that on previous occasions when he lived with the victim, they broke up because "she was getting free cocaine from the Mexicans that she was running around with." He admitted that due to the weather, he did not work on the Thursday before the victim's death. Mr. Leuty acknowledged that he "climbed over one corner of the bed" when he went into the apartment through the bedroom window. He said he did not see the blood under the bed until after he was released from jail.

Mr. Leuty testified that he saw a "shrink" regularly because he had nightmares about finding the deceased victim. He acknowledged that he did not find out how the victim was killed until a couple of weeks after his release from jail on September 22. He acknowledged sending an e-mail to the prosecutor on October 19, in which he described a hammer that belonged to the victim but admitted the email did not say anything about it having been her grandfather's. He acknowledged that he knew on October 19 that the Defendant had been charged with killing the victim. On redirect examination, Mr. Leuty said he could not be sure whether he first saw the puddle of blood underneath the bed on August 19 or after he was released from jail.

Janice Gangwer testified that she was employed by the Knoxville Police Department and that in 2005 she was assigned to the Forensic Unit. She said that on August 19, 2005, she responded to the scene of the victim's death, 1347 Alliance Avenue, where she took photographs and collected evidence. She identified several photographs of the scene.

5

After Ms. Gangwer was accepted over defense objection as an expert in blood spatter analysis, she testified that the blood on the front porch of the home where the victim's body was found consisted of round droplets. She said this indicated that the droplets were dripping from something. She said she collected samples of the blood. She also collected sunglasses with a red stain from the porch, which she sent to the TBI for analysis. She identified a photograph of the inside of the apartment entrance depicting a handprint with a red stain on tile and blood droplets on the floor near the doorframe. She identified another photograph depicting a smear of blood on the storm door. She said that she used amido black to develop the blood in the handprint for identification, photographed it, and removed the tile. She also collected samples of the blood droplets on the floor for analysis. She said that she did not recall any blood in the living room or kitchen but that they collected cigarette butts from the living room.

Ms. Gangwer testified that the home had three bedrooms. She said there were blood droplets at the doorway to the "middle front bedroom," which was located down a hallway. She said she collected samples of this evidence. She said that the victim's body was found in the back bedroom and that there were blood droplets on the floor of that room. She identified a photograph of the victim, depicting "a significant quantity of blood in [the victim's] hair and her face and saturating her shirt and the bed clothing . . . enough blood to saturate right through the top mattress and down into the box springs," although she said there was no puddle of blood on the floor. She said there was no blood spatter on the walls or the curtain. She said that a spring was missing from a latch on the bedroom window.

Ms. Gangwer testified that there was a wastebasket in the kitchen that contained a black rubber grip. She said the grip was collected and submitted for DNA analysis. She said that there was a claw hammer in a drawer next to the wastebasket.

With respect to another apartment that was identified by other proof as the victim's apartment, Ms. Gangwer testified that she collected a pair of blue jeans with red spots on them. She said she also collected samples from blood stains on the door and wall of the hallway at this apartment. She said this apartment was across the street from the apartment where the victim's body was found. She said she measured the distance between the two apartments as forty-two steps.

Ms. Gangwer testified that she accompanied police investigators to Pleasant Ridge, where they located the Defendant. She said the Defendant was taken to the police department, where she collected fingerprints from him for comparison. She identified a photograph of the Defendant taken around 4:00 a.m. on August 20, which she said depicted a ragged laceration on the right side of his head.

6

On cross-examination, Ms. Gangwer acknowledged that she did not collect a sample of blood that was on top of the hallway side of the bedroom doorframe where the victim's body was found. She said the wound on the Defendant's head was between one and two inches long. She acknowledged that she did not have any of the cigarette butts that she collected analyzed. She again stated that there was not a large puddle of blood under the bed, but she said there was some blood there.

Michael Pruitt testified that in August 2005, Michael Leuty was one of his employees and that his business "built decks and things of that nature." He said Mr. Leuty worked for him for four or five months and that he provided Mr. Leuty's transportation. He said he picked up Mr. Leuty on August 19 around 7:10 to 7:30 a.m. at a home diagonally across the street from a home that was identified to him as the victim's and that he had been doing so for a week and a half to two weeks. He said that he saw a red F150 truck and a blue or green car parked at the victim's home that morning and that these vehicles were not usually there. He said that Mr. Leuty did not seem unusual that day, that they worked together all day, and that he brought Mr. Leuty home around 6:30 or 7:00 p.m.

Mr. Pruitt testified that he usually smoked cigarettes with Mr. Leuty when he brought Mr. Leuty home. He said that on August 19, he and Mr. Leuty talked outside and that Mr. Leuty found the apartment door locked. He said that they smoked together and that Mr. Leuty then opened a window with a saw blade. He said he held the window open for Mr. Leuty to crawl inside. He said Mr. Leuty went to the front of the apartment and outside to retrieve his tool bag. He said Mr. Leuty went back inside and started screaming for him to call 9-1-1. He said Mr. Leuty came outside, shaking and talking incoherently. He said Mr. Leuty always wore sunglasses and that he thought Mr. Leuty left them on the porch that evening. He said he was not able to get through to 9-1-1 for about twenty minutes. Mr. Pruitt testified that as Mr. Leuty came from the apartment, two men he did not recognize were walking toward the car and the truck across the street. He said that they appeared to be Hispanic and that one of the men exchanged stares with Mr. Leuty before driving away. He said Mr. Leuty was so disturbed that he was unable to work after August 19.

On cross-examination, Mr. Pruitt testified that the apartment door was usually unlocked. He acknowledged that when he was interviewed on the night of August 19, he told the detective that the people who lived next door were Mexican based upon what someone else told him. He said all he remembered about the people he saw was that they were neither black nor white. He said he was certain, however, that the people were Hispanic.

7

TBI Special Agent Jennifer Millsaps testified as an expert witness in forensic DNA analysis. She said that she analyzed items of evidence collected from the scene and compared them with standards collected from the victim, the Defendant, and Mr. Leuty. She said that there was blood on the sunglasses and the floor tile that matched the victim's DNA profile. She said the probability that the profile matched someone other than the victim exceeded the world population. She said that the reddish-brown stain from the porch matched the Defendant's DNA profile and that the probability that the profile matched someone other than the Defendant exceeded the world population. She said that the reddish-brown stain from the front door matched the Defendant's DNA in some locations but that the results were inconclusive in a few locations.

Knoxville Police Department Detective Joseph Huckleby testified that he was assigned to the Major Crimes Unit and that he investigated the victim's death. He said that he responded to 1349 Alliance Drive about 8:00 p.m. on August 19, 2005. He said that he could not tell from viewing the victim's body how she had been killed, although he could tell she had a head injury. He said her body and hair were in disarray and that there was a large amount of blood.

Detective Huckleby testified that after a witness told him the victim lived across the street, he also investigated at an apartment across the street. He said that no one was home at that apartment but that he found several items of evidence. He said he found a tool handle, a red-handled claw hammer, and stained blue jeans.

Detective Huckleby testified that after learning the Defendant was at a location on Pleasant Ridge Road, he traveled there and had contact with the Defendant for twenty or twenty-five minutes. He said that the Defendant had a bleeding head injury and that the Defendant agreed to go to the police station. He said that there was a language barrier because he did not speak Spanish, that he needed a certified interpreter present to interview the Defendant, and that he photographed the Defendant's injury but did not interview him.

Detective Huckleby testified that he later asked the Defendant to return for an interview through an interpreter and that the Defendant did so voluntarily. He said he interviewed both the Defendant and the Defendant's brother on August 20. He said that at that point, he did not have any information about how the victim died. He said the Defendant claimed to have no knowledge about the victim's death and to have last seen the victim on August 16. He said the Defendant claimed to have left for work between 7:45 a.m. and 8:00 a.m. and not to have returned until after he left work between 5:00 p.m. and 5:45 p.m. He said that the Defendant first told him that the cut on his head happened at work but that he admitted in a later interview that the victim hit him.

Detective Huckleby testified that he learned from a crime technician that the bloody handprint found at the crime scene belonged to Michael Leuty. He said, however, that he did not see any blood on Mr. Leuty when he talked to him shortly after the crime. He said that he interviewed Mr. Leuty at least three times and that he eventually arrested Mr. Leuty for the victim's murder. He said that in the first interview, Mr. Leuty was unable to explain how his handprint got onto the floor and that he was upset and "elusive." Detective Huckleby identified a hammer that was recovered from a kitchen drawer at the crime scene. He also identified a "black rubber grip" that was taken from the kitchen trash can.

Detective Huckleby testified that after speaking with Agent Millsaps on the telephone and learning that some of the blood samples were the Defendant's, he interviewed the Defendant again. He said the Defendant came to the police station voluntarily on September 22. He identified the Defendant's waiver of rights form from this interview. He said he followed the procedure for obtaining a certified interpreter for this interview. He said that at the time, he did not know whose blood was on the hammer and that he had not seen any blood on the hammer. He said that after the interview, he immediately had Michael Leuty released and apologized to him. A videotape of the Defendant's September 22 statement was played for the jury, in which the Defendant admitted hitting the victim on the head with a hammer and claimed that she hit him first.

On cross-examination, Detective Huckleby acknowledged that his written "continuing report" omitted information he learned during the investigation. He said he did not have information from Ms. Swann and Mr. Leuty about the hammer until after the Defendant was arrested. He acknowledged that when he was on the scene, he had the hammer photographed and collected despite not knowing how the victim was killed. He also acknowledged that contrary to his earlier testimony, Mr. Leuty claimed never to have touched the victim's body but that he wrote in his report that Mr. Leuty admitted having climbed over the body and having turned it over. He said his report also stated that Mr. Leuty claimed he had not looked at or seen anything on the victim's body. He also admitted that his report omitted information about a child having seen the Defendant and the Defendant's brother at the scene and said he did not include the information because he was unable to confirm it due to the child's mother not cooperating.

Detective Huckleby testified that he interviewed Elizabeth Koetzler four times. He denied any memory of saying to her that he thought she was responsible for the victim's death. After a portion of one of the video recorded interviews was played, he said he was unsure whether his statement to her, "I still think you did it, all I [have] to do is prove it," was about the killing.

9

Detective Huckleby admitted that when he went to find the Defendant in the early morning of August 20, he and other officers went to an identified location. He said he did not know who may have had their guns drawn but that he did not. He admitted the Defendant was "being detained for an investigation" and was taken to the police department in handcuffs. He also admitted that the Defendant was taken to the squad room on a secure floor of the building. He acknowledged that the Defendant returned voluntarily to give a blood sample and again for an interview.

Detective Huckleby acknowledged that the police lie to suspects "all the time" as an investigative technique. He admitted telling the Defendant he would not hold anything said in confidence against the Defendant. He admitted he knew the Defendant's admissions would be used against him but said he meant he would not personally hold anything against the Defendant. He said the Defendant told him that he had gone to the apartment across the street and that the victim threatened to kill him if he did not leave. Detective Huckleby said the Defendant claimed he "kind of blacked out" when the victim hit him and that he then saw the hammer and reacted by hitting the victim. He said the Defendant claimed not to remember how many times he hit the victim. He said that after the Defendant said he left the hammer "at the side of the apartment," he asked the Defendant if the hammer was in the kitchen drawer and that the Defendant said it was. He said that he asked whether there was a piece in the trash can and that the Defendant said, "Probably. I don't remember." He said the Defendant claimed he had not given this information during the first interview because he was scared.

Detective Huckleby clarified that in the last interview, the Defendant mentioned the hammer first. He admitted that he already knew about the hammer. He said he did not recall the Defendant's stating where he was in the house when the victim hit him with the hammer.

Dr. Darinka Mileusnic-Polchan testified as an expert in forensic pathology. She said she reviewed the records of the victim's autopsy, which was performed by another doctor. She said the significant finding was blunt head trauma. She said the victim was hit multiple times, with three main lacerations on the right side. She said that one of these lacerations was slightly curved and about one inch long. She said that the curved shape indicated that the blunt object used to inflict it had a slightly curved edge, which she said was consistent with the head of a claw hammer depicted in a photograph exhibit that had been identified previously as the hammer from the kitchen drawer. She said that scalp injuries produced very heavy bleeding and that blood would have been transferred onto the hammer. She identified a second wound, which also had a curved appearance consistent with the victim's having been struck with a hammer similar to the photographed hammer. She also identified a third wound on the right side of the victim's head. Dr. Mileusnic-Polchan testified that one wound was on the left side of the victim's

10

head. She said that its appearance was similar to the three wounds on the right side of the head and that it was consistent with having been struck by the head of a hammer.

Dr. Mileusnic-Polchan testified that there were three wounds on the back of the victim's head, two of which were simple and relatively small. She described the third as "a very large and complex wound." She said the large wound was 2.4 inches long and that its top was almost square-shaped, which indicated that as compared with the other wounds, a different part of the same object or a different object was used to inflict the wound. She said that there was a large area of skin torn from the skull as well as skull fractures, which she said almost certainly resulted from multiple blows. She said that the skull is very difficult to open and that forceful blows would be required to create this type of injury. She said there were fractures radiating "all across the head." She said that the injury to the back of the head would have rendered the victim unconscious quickly but that it was difficult to tell whether the injuries to the side of the head would have done the same. She said that she could not determine the order in which the injuries occurred but that the large one at the back of the head was the cause of death. She noted that the victim died face-down. She said that the cause of death was blunt head trauma due to multiple blows with a blunt object.

Dr. Mileusnic-Polchan testified that based upon her review of a photograph of the victim's body at the scene and the autopsy report, it was her opinion that the victim's body was face-down at the time of death but was later moved. Testifying from viewing a photograph of the victim's skull, Dr. Mileusnic-Polchan said that some parts of the skull were driven into the brain by the force of the injury. From other photographs taken at the autopsy, she identified contusions on the victim's proximal upper arm and clustered on the back of the victim's right hand. She said that the right index finger was fractured and that the tissue was almost stripped off the finger. She said there was hair with blood on it entangled in the finger injury, which could mean the victim tried to protect her head. She said the clustered contusions on the back of the hand were "classic defensive wounds."

On cross-examination, Dr. Mileusnic-Polchan acknowledged that she could not say that the injuries were caused by a hammer, only that the injuries were consistent with a claw hammer. She admitted the possibility that the victim's hair became entangled in her broken finger when the body was moved. She said that due to the splitting of the victim's skin, it was unlikely that the associated injuries were inflicted when the victim was moving. She acknowledged that if the victim had been standing when some of the injuries occurred and had blood on her feet, the blood could have been removed if the victim's feet later became wrapped in a sheet or unwrapped from a sheet. She said that the victim would have been unconscious after all of the blows were inflicted.

11

Dr. Mileusnic-Polchan estimated that the injuries and the death occurred sometime between 7:00 and 10:00 a.m. She said the victim had cocaine residue in her urine but not in her blood.

The Defendant did not present any proof. The jury found the Defendant guilty of first degree murder. The trial court imposed a life sentence. This appeal followed.

**I**

As a preliminary matter, the State argues that the appeal should be dismissed due to an untimely notice of appeal. The Defendant has not responded to this argument. Examination of this issue requires us to consider a related issue raised by the Defendant, whether the trial court erred in determining that the motion for new trial was not timely, depriving the trial court of jurisdiction to adjudicate the merits of the motion.

The record reflects that the trial court filed its judgment on March 27, 2008, the same day the verdict was returned. At the end of the trial, the court announced that the Defendant's sentence would be life, although the court did not have the Defendant stand and did not make a formal pronouncement of sentence. The court noted that a presentence report would need to be prepared, and it set the case for May 16, 2008, for a "sentencing hearing." The trial judge said that at that hearing, they would choose a date for a hearing on the motion for a new trial. On May 2, 2008, the parties were in court, and defense counsel stated that he "need[ed] some guidance." He noted that a sentencing hearing was set for May 16, and he stated he did not "have any plan to file . . . anything to get [the Defendant a lesser sentence than life]." He noted that his client had already been transported to the Department of Correction and inquired whether he needed to obtain a transportation order for the Defendant to return for later proceedings. Defense counsel stated that he understood that a date would be chosen at the May 16 hearing for the hearing on the motion for new trial. The court urged the Defendant to file a motion for new trial and set a July 16 hearing on the motion for new trial, allowing time for preparation of the trial transcripts before the hearing.

The Defendant filed his motion for new trial on May 2, 2008, which the trial court denied on November 13, 2008, on the basis that it was untimely. The Defendant filed a motion to reconsider and a motion to correct clerical errors, in which he challenged the judgment filed on March 27, 2008, without a sentencing hearing. The Defendant sought to have the trial court set aside the judgment or allow a sentencing hearing, after which judgment would be entered. The motions were denied on December 18, 2008, and March 6, 2009, respectively. The Defendant filed his notice of appeal on March 10, 2009, almost a year after the judgment was filed.

12

The Rules of Criminal Procedure provide, "A motion for a new trial shall be [made] within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). Our supreme court has held that the thirty-day limit for filing a motion for a new trial is mandatory and that a trial court does not have jurisdiction to hear and determine the merits of a motion for new trial if it is filed outside the thirty-day period. State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Thus, when a defendant has not filed a timely motion for a new trial, he has not preserved those issues for appeal that are required to be raised in a motion for a new trial. Id.; see T.R.A.P. 3(e).

In the present case, the Defendant filed his motion for a new trial more than thirty days after the entry of judgment. He contends, however, that the judgment was improperly entered because he was not afforded a sentencing hearing at which he was formally addressed and sentenced by the court and was not allowed to make an allocution. He reasons that no valid judgment was entered against him and that as a result, the trial court did not lose jurisdiction to consider his claims of trial error. The State responds that the Defendant was properly sentenced at the conclusion of the trial on March 27 and that the court's failure to give the Defendant the opportunity to make an allocution was harmless error because the trial court imposed a life sentence, which was the only sentence available for the Defendant's first degree murder conviction.

Our court has said:

> Allocution has been defined "as the formality of the court's inquiry of a convicted defendant as to whether he has any legal cause to show why judgment should not be pronounced against him on the verdict of conviction." State v. Stephenson, 878 S.W.2d 530, 551 (Tenn. 1994) (citing Black's Law Dictionary 76 (6th ed. 1990)) (footnote omitted). It is "an unsworn statement from a convicted defendant to the sentencing judge or jury in which the defendant can ask for mercy, explain his or her conduct, apologize for the crime, or say anything else in an effort to lessen the impending sentence. This statement is not subject to cross-examination." Black's Law Dictionary 75 (7th ed. 1999); see also United States v. Gilbert, 244 F.3d 888, 924 (11th Cir. 2001).

State v. Keathly, 145 S.W.3d 123, 125-26 (Tenn. Crim. App. 2003). A defendant in a non-capital case has a statutory right to allocution before sentencing. T.C.A. § 40-35-210(b)(7) (2006). It is undisputed in this case that the trial court failed to allow the Defendant his statutory right of allocution.

13

The question is, however, whether the failure to allow allocution was error that affected the validity of the judgment. The Defendant's argument assumes that an erroneous judgment is the equivalent of a void judgment. The two are not the same. A voidable or erroneous judgment "is valid to some extent," but a void judgment "is valid to no extent." Moren v. Killebrew, 10 Tenn. 376 (1830); see, e.g., Edwards v. State, 269 S.W.2d 915, 921 (Tenn. 2008) (a void judgment is one in which the trial court lacked jurisdiction to act). In the present case, the court had jurisdiction over the subject matter and the Defendant. The court failed to afford the Defendant the opportunity to make an allocution. We fail to see how this statutory error rendered the judgment void, resulting in the thirty-day period within which the Defendant could file a motion for a new trial never being triggered. The Defendant's argument, at best, presents a case in which the trial court entered a lawful, albeit erroneous, judgment, not one in which the judgment was void.

In any event, we note that the trial court's failure to allow the Defendant the right to allocute was harmless error. We acknowledge that in Keathly, this court said, "It is settled that a failure to comply with the mandate of [allocution] ordinarily requires vacation of the sentence imposed without a concomitant inquiry into prejudice. This is so precisely because the impact of the omission on a discretionary decision is usually enormously difficult to ascertain." Keathly, 145 S.W.3d at 126 (quoting United States v. Pagan, 33 F.3d 125, 129-30 (1st Cir. 1994)) (footnotes omitted). The Keathly court noted, however, that vacating the sentence would not necessarily be required in the case of a defendant who received the minimum sentence. Keathly, 145 S.W.3d at 126 (citing United States v. Pagan, 33 F.3d 125, 130 (1st Cir. 1994)). In the present case, the Defendant received a life sentence, which was the only sentence possible given that the State did not seek the death penalty or life without parole. See T.C.A. §§ 40-35-202(c) (sentencing for first degree murder includes life, life without parole, and death); -208 (requiring the State to file a notice of intent to seek a sentence of death or life without parole). Thus, an allocution by the Defendant would have had no effect on the sentence the Defendant received, and the court's procedural error in imposing the sentence did not prejudice the Defendant.

In addition, the record reflects that the Defendant did not make a proffer in the trial court of his allocution to show how he was prejudiced. See Mario Antwan Fulgham v. State, No. E2009-01240-CCA-R3-PC, Hamilton County, slip op. (Tenn. Crim. App. June 7, 2010) (post-conviction petitioner who alleged that trial counsel was ineffective for failing to inform him of his right to allocution failed to show prejudice because he did not testify at the hearing to establish what he would have said at the allocution), app. denied (Tenn. Sept. 3, 2010). For this additional reason, the Defendant has failed to show prejudice in the entry of the judgment.

14

Having determined that the trial court's judgment was not void, we conclude that the Defendant filed an untimely motion for new trial and that the trial court did not err in determining that it lacked jurisdiction to consider the motion. See State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989) (a trial court does not have jurisdiction to consider the merits of an untimely motion for new trial). Further, the Defendant's untimely motion for new trial waived appellate consideration of all issues other than sufficiency of the evidence and any matters of plain error. See T.R.A.P. 3(e), 36(b). Our consideration of issues II, III, and IV below is limited accordingly.

In so holding, we acknowledge the Defendant's assertion at oral argument in this court that he was misled by the trial court's entry of judgment before the May 16 "sentencing hearing" and that his failure to file a timely motion for new trial was based upon his reliance on the trial court's announcement of a May 16 sentencing hearing date. These asserted facts do not affect our consideration because neither this court nor the trial court possess authority to waive the timely filing of a motion for new trial because the lack of a timely motion for new trial ends the trial court's jurisdiction. See Dodson, 780 S.W.2d at 780.

We turn now to the question of timeliness of the Defendant's notice of appeal. The Rules of Appellate Procedure provide that unless certain motions are filed, including a motion for new trial, a party has thirty days from the entry of the judgment to file the notice of appeal. T.R.A.P. 3(e), 4(a)(c). No other motion, including one for rehearing or for reduction of sentence, is allowed to suspend the running of the appeal time from the entry of the judgment. See State v. Lock, 839 S.W.2d 436, 440 (Tenn. Crim. App. 1992); State v. Bilbrey, 816 S.W.2d 71, 74-75 (Tenn. Crim. App. 1991).

The Defendant had thirty days from March 27, 2008, to file his notice of appeal. He did not do so until March 10, 2009. The notice of appeal was untimely.

The State urges us to dismiss the appeal due to the untimely notice. The Defendant has not responded.

An attorney who fails to perfect a timely appeal from the entry of a judgment places his client's appeal in peril of dismissal. See T.R.A.P. 4(a). Although certain post-judgment motions may suspend the time for filing the notice of appeal, none of those motions were timely filed in this case. See T.R.A.P. 4(c). However, Rule 4(a) provides that the notice of appeal "is not jurisdictional and the filing of such document may be waived in the interest of justice." T.R.A.P. 4(a). "In determining whether waiver is appropriate, this Court will consider the nature of the issues presented for review, the reasons for and the length of the delay in seeking relief, and any other relevant factors

presented in the particular case." State v. Markettus L. Broyld, No. M2005-00299-CCA-R3-CO, Davidson County, slip op. at 2 (Tenn. Crim. App. Dec. 27, 2005).

The Defendant in the present case challenges the sufficiency of the convicting evidence for first degree murder, for which he is serving a life sentence. Although his remaining issues have been waived for review other than plain error, we elect to waive the timely filing of a notice of appeal. While we recognize that defense counsel may have held the mistaken belief that there was a fatal error in the judgment, we note that counsel was also delinquent in filing his motion for new trial and did not file a reply brief responding to the State's argument that the appeal should be dismissed. We caution counsel that compliance with applicable court rules, including the Tennessee Rules of Appellate Procedure, is expected of attorneys who practice before the Court of Criminal Appeals.

**II**

The Defendant contends that the evidence was insufficient to support his conviction. The State counters that the evidence is sufficient to support the conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

Circumstantial evidence alone may be sufficient to support a conviction. State v. Richmond, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, to warrant a criminal conviction on circumstantial evidence alone, the evidence "must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt." Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970). While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the

16

jury." Marabel v. State, 313 S.W.2d 451, 457 (Tenn. 1958) (quoting 2 Wharton's Criminal Evidence 1611).

The Defendant was charged with the unlawful, premeditated, and intentional killing of the victim. See T.C.A. §§ 39-13-201 (2010), -202(a)(1) (2003) (amended 2007). "Premeditation" is defined as an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. "It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." T.C.A. § 39-13-202(d). The element of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. "'Intentional' refers to a person who acts intentionally with respect to . . . a result of the conduct when it is the person's conscious objective or desire to . . . cause the result." T.C.A. § 39-11-106(a)(18) (2003) (amended 2009).

The Defendant does not contest that he hit the victim with the hammer or that she died. He argues that there is insufficient proof of premeditation. Our supreme court has noted the following factors that demonstrate the existence of premeditation: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the Defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, and calmness after the killing. Bland, 958 S.W.2d at 660. In addition, "[e]stablishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

In the light most favorable to the State, the evidence demonstrated that the victim and the Defendant had been involved in a romantic relationship that the victim no longer desired. The victim reunited with Mr. Leuty, a former boyfriend, and moved temporarily to another apartment to hide from the Defendant. The Defendant took a hammer from the victim's apartment across the street to the apartment where the victim was staying and bludgeoned her to death. The medical proof established that the victim was hit forcefully several times with an object consistent with a hammer, causing seven distinct injuries, and that her injuries were consistent with her head not moving, as if it were on the bed when the blows were inflicted. The injuries were also consistent with both the head and the claw ends of the hammer having been used. The blows were inflicted with such force that a portion of the hammer's handle broke. Mr. Leuty testified that when he left for work around 7:30 or 8:00 a.m., the victim was sleeping in his bed, where he later found her body. After injuring the victim, the Defendant did nothing to get medical assistance.

17

Instead, he went across the street and changed from his bloody clothing and concealed the weapon in a drawer. The evidence is sufficient to support the Defendant's conviction.

**III**

The Defendant contends that the trial court erred in denying his motion to suppress his second pretrial statement. The State counters that the issue was waived by the Defendant's failure to file a timely motion for new trial and that plain error does not require relief. We agree with the State.

As we noted above, the Defendant waived our consideration of all issues other than sentencing and sufficiency of the evidence because he did not file a timely motion for a new trial. We will consider only whether the record shows plain error in the denial of the motion to suppress.

This court may review the record for plain error "that has affected the substantial rights of a party" when "necessary to do substantial justice." T.R.A.P. 36(b). Our supreme court has adopted the factors developed by this court to be considered

> when deciding whether an error constitutes "plain error" in the absence of an objection at trial: "(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before an appellate court can recognize plain error, but our consideration of all the factors is unnecessary where the record reflects that at least one of the factors cannot be established. Id. In order for this court to reverse the judgment of a trial court, the error must be "of such a great magnitude that it probably changed the outcome of the [proceedings]," and "recognition should be limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Adkisson, 899 S.W.2d at 642.

A defendant's statements made during a custodial police interrogation are only admissible if the state establishes that the defendant was advised of certain constitutional rights, including the right to an attorney and the right to be silent. Miranda v. Arizona,

384 U.S. 436, 444 (1966). Once a suspect subject to custodial interrogation makes an unequivocal request for an attorney, all interrogation must cease unless the suspect initiates conversation with the police. Edwards v. Arizona, 451 U.S. 477, 484-85 (1981); State v. Stephenson, 878 S.W.2d 530, 545 (Tenn. 1994).

An appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The evidence presented at the pretrial hearing and the trial demonstrated that the Defendant gave two pretrial statements and that he was given proper Miranda warnings before both. He did not make any inculpatory statements in his first interview. In the second, he waived his rights, of which he was advised in both English and Spanish. He also signed a written waiver of rights, which was in English. A certified interpreter translated during the entire process. He acknowledged his understanding after both admonitions. Well into the interview, the Defendant asked if what he said to Detective Huckleby would be confidential and would not be used against him. The detective responded that he would not personally hold the Defendant's statements against the Defendant. Detective Huckleby made no assurances contrary to the earlier Miranda warnings that the Defendant would not be prosecuted. At an earlier point, he advised the Defendant that he might be charged with first degree murder. The Defendant also asked whether he needed someone present to help him. The detective responded that this was the reason he and an officer were there. The Defendant then admitted that he hit the victim with the hammer, although he claimed she hit him with it first.

The Defendant testified that he thought he was having a personal conversation and that he would not incriminate himself by talking to the investigator. He said he thought the detective was there to help him. He said that when he asked about someone helping him, he meant "[a] person that would help me." He did not testify that he was requesting an attorney.

19

The trial court found that the Defendant's questions did not invalidate his previous waiver of his rights. The court found that the Defendant had a limited understanding of English but that he had been advised of his rights on two occasions in his native language. The trial court found that although the Defendant may not have understood every consequence of the waiver and may not have been familiar with the legal system, the proof demonstrated that he understood the rights he waived and that his questions did not invalidate the waiver.

The record does not establish plain error. The facts found by the trial court are supported by the record, and they support the court's legal conclusion. The Defendant has not shown that a clear and unequivocal rule of law was breached, that a substantial right was adversely affected, or that consideration of the error is necessary to do substantial justice. The Defendant is not entitled to relief.

**IV**

The Defendant contends that the trial court erred in denying motions for a mistrial due to the State's failure to disclose discovery materials. The State counters that the Defendant waived consideration of the issue by failing to file a timely motion for new trial and that there was no manifest necessity for a mistrial. We agree with the State.

As noted above, our review is limited to whether the record reflects plain error in the trial court's denial of the Defendant's motion for a mistrial. A mistrial should be declared only if there is a manifest necessity for such action. Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision of whether to grant a mistrial is within the sound discretion of the trial court. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). This court will not disturb that decision unless there is an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990); State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981).

In the present case, the Defendant sought a mistrial based upon violations of Brady v. Maryland, 373 U.S. 83 (1963). In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Id. at 87. In order to establish a due process violation under Brady, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which

case the State is bound to release the information, whether requested or not);

2. The State must have suppressed the information;

3. The information must have been favorable to the accused; and

4. The information must have been material.

State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995); see also State v. Evans, 838 S.W.2d 185 (Tenn. 1992). Evidence that is "favorable to the accused" includes evidence that is deemed to be exculpatory in nature and evidence that could be used to impeach the State's witnesses. State v. Walker, 910 S.W.2d 381, 389 (Tenn. 1995); State v. Copeland, 983 S.W.2d 703, 706 (Tenn. Crim. App. 1998); see also United States v. Bagley, 473 U.S. 667, 676 (1985).

The "prosecution is not required to disclose information that the accused already possesses or is able to obtain." State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). Although the State is not obligated to disclose the entirety of the investigatory police work in a case, the State is required to disclose all favorable evidence obtained by any person acting on the government's behalf. See Moore v. Illinois, 408 U.S. 786, 795 (1972)). When the issue is one of delayed disclosure, rather than nondisclosure, the court must conduct "an inquiry into whether the delay prevented the defense from using the disclosed material effectively in preparing and presenting the defendant's case." State v. Caughron, 855 S.W.2d 526, 548 (Tenn. 1993); United States v. Ingraldi, 793 F.2d 408 (1st Cir. 1986).

The evidence in question consists of (1) information that Michael Leuty was receiving mental health treatment; (2) a four-page report prepared by Detective Huckleby, rather than a one-paragraph summary of the report; (3) information from witnesses who claimed to have seen the hammer in the victim's apartment before the crime; and (4) results of a polygraph examination of Elizabeth Koetzler in which deception was indicated. The Defendant's brief also mentions that the State had an obligation to turn over information "regarding State's witness Charles Harlan," although the record before us does not contain any information that Charles Harlan was involved in the case.

An understanding of the disclosure disputes and their chronology during the trial is necessary for examination of the issue. The record reflects that the prosecution and the defense did not have a cordial working relationship, due at least in part to discovery disputes that arose before the trial. The first mid-trial dispute arose on the first day of the

21

trial, March 24, relative to the State having failed to provide the defense with Barbie Swann's September 30, 1995 police interview at the end of its direct examination of Ms. Swann. The State's lack of disclosure came to light during redirect examination of Ms. Swann, when there was confusion about the dates of her various interviews. The defense acknowledged that the State provided tapes of two August interviews of Ms. Swann in pretrial discovery but not the September 30 statement. The State took the position that it was under no obligation to provide the September 30 statement because the Defendant never made a request for production of witnesses' statements pursuant to Tennessee Rule of Criminal Procedure 26.2. The defense then requested the taped statement, and the State provided it.

Later that day, the defense moved for a mistrial on the basis of the non-production of Ms. Swann's statement both during discovery and after direct examination. Defense counsel acknowledged that he never made a formal Rule 26.2 request for production of statements. He said he requested pretrial discovery and had no way to know that he had not been provided with everything in existence. He said there was an earlier hearing at which he said he stated on the record that he wanted all discoverable information. The court denied the motion for a mistrial on the basis that the defense never made a Rule 26.2 motion. The defense then requested that all Rule 26.2 material be provided after the direct examination of the remaining State's witnesses. The court stated that in order to expedite the next day's proceedings, its "preference" was for the State to provide the defense that evening with all information that was subject to production under Tennessee Rule of Criminal Procedure 26.2 for the next day's witnesses.

Another dispute arose on the first day of trial about the State's failure to disclose that Michael Leuty was receiving mental health care related to nightmares due to his having discovered the victim's body after her death. Defense counsel alleged he had never received this information until the witness revealed it during cross-examination. The defense moved for a mistrial. The prosecutor stated that he first learned about Mr. Leuty's mental health treatment when talking with the witness the night before the trial began. He said that he called the witness's mental health provider and that she did not reveal anything that would have been exculpatory and therefore discoverable under Brady. The trial court ruled that when the State learned of the information, it was obligated to disclose it to the defense. The court found that the State did not have any of Mr. Leuty's treatment records and that it had no obligation to obtain them for the defense. The court took the matter under advisement.

On the second day of the trial, the court resumed the hearing on the defense's motion for a mistrial. Defense counsel said that despite his previous statement that he did not make a formal Rule 26.2 request, he determined after overnight review of his file that he had filed a discovery request that included witness statements under Rule 26.2. The

State said it did not have Mr. Leuty's mental health treatment records, and the court stated that it would attempt to obtain them. When asked by the court, the prosecutor said he was unaware of any additional Rule 26.2 material that was not provided to the defense the previous evening. The defense notified the court that it did not have Detective Huckleby's Investigative Action Report. The prosecutor represented to the court that the defense had any reports generated by law enforcement officers that were in his possession.

Later that day, during cross-examination of Detective Huckleby, the witness acknowledged that he created an Investigative Action Report. Defense counsel inquired about a notebook to which the witness referred during his testimony and requested that he be allowed to review it. The court recessed to allow defense counsel to do so, after which the defense stated that items were in the notebook that had not been provided. The defense noted that a four-page report by Detective Huckleby was in the notebook but that in pretrial discovery, only a one-page document containing a summary paragraph had been furnished. The defense also noted that there was a polygraph report for Elizabeth Koetzler of which it had been unaware. The prosecutor stated that he did not realize that the Defendant had not been provided with the longer report before trial and that "for all [he] knew," the defense was already aware of the contents of the longer document when he provided the Rule 26.2 information to defense counsel the previous night. The record reflects that due to the animosity between the prosecutor and defense counsel, before trial the prosecutor filed a motion to clarify what the defense had received, and the defense filed a "discovery receipt" listing the documents it had. The record also reflects that due to the volume of information and the difficulties the attorneys had working together, there was confusion before trial about what the State provided and what the Defendant received. When the State's error in not disclosing the documents came to light, the trial court allowed the defense additional time to review the information. The court stated that it would conduct an extended hearing the next morning on the disclosure matters.

The trial continued with an extensive cross-examination of Detective Huckleby. The court allowed defense counsel to question the witness about his investigation relative to Ms. Koetzler and his willingness to accuse people other than the Defendant of killing the victim. The court ruled that any proof of the polygraph examination itself was inadmissible. In addition, the defense cross-examined Detective Huckleby about his failure to document in his four-page report information about Mr. Leuty's and Ms. Swann's statements about their knowledge of the hammer, including an e-mail that Mr. Leuty sent to the prosecutor. As noted above, the third interview of Ms. Swann was provided to the defense on the first day of the trial, and defense counsel acknowledged that he "didn't say there was anything improper about" when he received the e-mail document.

The next morning, which was day three of the trial, the trial court conducted a hearing about the alleged violations of Brady and Rule 26.2 relative to the items mentioned above, in addition to the State's non-production of an alleged suicide note written by Michael Leuty. An issue about the note has not been raised on appeal. Michael Leuty and Detective Huckleby testified at the hearing regarding the alleged suicide note and Detective Huckleby's failure to document some of his investigative steps, which he defended on the basis that they did not result in evidence about the crime. The record reflects that during its consideration of the matter, the court also reviewed Mr. Leuty's mental health records and provided them to the parties. After receiving the evidence, the trial court denied the Defendant's motion for a mistrial. With respect to Mr. Leuty's mental health treatment, the court found that the State should have informed the defense of the evidence as soon as the State was aware of it the night before the trial began. The court said, however, that "[the defense] would have still been in the same position where [it] is now." The court found that upon review, nothing in the records suggested any benefit to the Defendant in cross-examining Mr. Leuty. Thus, the court determined that the defense had not shown that it was prejudiced by the delay in preparing and presenting the case. With respect to the undisclosed polygraph information, the court ruled that it should have been disclosed as Brady material. The court found that the State might have inadvertently not provided the four-page police report that mentioned Elizabeth Koetzler's failing a polygraph. The court said, though, that there was no explanation for the State's failure to provide the separate one-page polygraph report. The court ruled that the State would not be allowed to call Elizabeth Koetzler as a witness.

Against this backdrop, we return to the issue of whether the Defendant has shown plain error in the trial court's denial of a mistrial due to discovery violations. The record before us, although not fully developed due to the lack of a timely motion for new trial and a hearing on the motion, does not reflect that there was manifest necessity for a mistrial. We in no way condone the State's repeated failures to provide Brady and Rule 26.2 information to the defense. The trial court admonished the prosecutor at length and mentioned shortcomings in the way discovery was handled by the district attorney's office, and we agree that the discovery violations in this case were without excuse. That said, the limited record before us does not establish that there was plain error in the denial of the motion for a mistrial. The record lacks proof that the delays in production of the information prevented the Defendant from using the information effectively, to the extent that it was relevant and exculpatory, in preparing and presenting the case. We recognize that the defense was in the middle of trial and may not have been able to demonstrate prejudice from having just learned of the information. Perhaps evidence of prejudice to the defense could have been developed at a hearing on the motion for new trial. However, in the absence of proof of prejudice, plain error cannot be established. The Defendant is not entitled to plain error relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE